AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
District of Massachusetts

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>University of Massachusetts – Amherst<br>Dorm Room of Thomas Kennedy McCormick<br>(As further described in Attachment A) | )<br>)<br>)<br>)<br>)<br>)    Case No.  13-MJ- 3104 -KPN |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See attachment A attached hereto.

located in the _____ District of _____Massachusetts_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See attachment B attached hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code,<br>Sections 1030(a)(5)(A), 1030<br>(a)(5)(B), and 1030(a)(5)(C) | Fraud and related activity in connection with computers. |

The application is based on these facts:
See attached affidavit of FBI SA David Hitchcock, which is incorporated by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of \_\_\_\_\_ days (give exact ending date if more than 30 days: _____ ) is requested
    under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

David Hitchcock,  Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: \_\_\_\_December 4, 2013\_\_\_\_

*Judge's signature*

City and state:  Springfield, Massachusetts

Kenneth P. Neiman, USMJ
*Printed name and title*

## AFFIDAVIT OF SPECIAL AGENT DAVID HITCHCOCK IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, David Hitchcock, state:

### *INTRODUCTION AND AGENT BACKGROUND*

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for five years.  I am currently assigned to investigate computer related crimes. As such, I have participated in numerous investigations involving computer and high technology related crimes including computer intrusions, Internet fraud, credit card fraud, and bank fraud. Throughout my FBI employment, I have received training in general law enforcement and in specialized areas including computer and white-collar crimes.  As a Special Agent of the FBI, I am authorized to investigate crimes involving computer intrusions and other financial crimes stated under federal law, including Title 18 of the United States Code.

2.      I am currently investigating Thomas Kennedy McCormick for his leadership role as administrator of a criminal hacking forum and for the creation and distribution of malicious software used in large-scale computer intrusions, in violation of Title 18, United States Code, Sections 1030(a)(5)(A), 1030(a)(5)(B), and 1030(a)(5)(C) (Fraud and related activity in connection with computers).

3.      This affidavit is being submitted in support of an application for a warrant to search the University of Massachusetts – Amherst dorm room of Thomas Kennedy McCormick located at 231 Baker Hall, 160 Clark Hill Road, Amherst, MA (hereinafter the "SUBJECT PREMISES"), as described in Attachment A, because there is probable cause to believe that it contains evidence, fruits, and instrumentalities of the crimes listed above, as described in Attachment B.

4.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses.

This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

### COMPUTER TERMS

3.      A "bot" is a computer that contains software program(s) enabling the computer to perform automated tasks.   The tasks can be performed either with or without the knowledge of the owner/user of the computer.   A bot can be directed to execute automated tasks by a remote computer and/or person.   The term is derived from "robot."   There are both illegal and legal uses for a bot.   However, in the context of this investigation, a bot is malicious in that it is used to send and receive commands on computers that have been illegally compromised.

4.      A "botnet" is a network of bots.   The term is derived from "robot network."   A botnet can be controlled and manipulated by its owner/operator from a remote location.   Some botnets may be comprised of thousands of computers operating as bots.   The term botnet is generally used to refer to a collection of compromised machines running programs, usually referred to as worms, Trojan horses, or backdoors, under a common command and control infrastructure.   A botnet's originator (sometimes referred to as a "botherder") can control the group remotely, often through Internet Relay Chat ("IRC," defined below) and usually for nefarious purposes.   Botnets serve various purposes, including launching and controlling denial-of-service attacks, creating and misusing Simple Mail Transfer Protocols ("SMTP") mail relays, and serving as proxies for spam, click fraud, and the theft of personal identifying information.

5.      A "proxy" is a computer that offers a computer network service to allow clients to make indirect network connections to other network services.   An open proxy is a computer which will accept client communications from another computer (the "originating computer") and make

2

connections to any Internet resource (the "target computer"); as a result, connections to the target computer appear to come from the proxy rather than the originating computer, i.e., the target computer sees the IP address of the proxy instead of that of the originating computer. Spammers frequently install open proxies on unwitting end users' operating systems by means of computer viruses designed for this purpose.

6.     "IRC," also known as Internet Relay Chat, is a form of real-time Internet text messaging. It is mainly designed for group communication in discussion forums, called channels, but also allows one-to-one communication via private message as well as chat and data transfers. Through IRC, a botnet's originator can control a group of computers remotely. Often the command and control takes place via an IRC server or a specific channel on a public IRC network. This server is known as the "command and control" server. Botherders can program their own command protocols. These protocols may include a server program, a client program for operation, and the program that embeds itself on the victim's machine.

7.     Companies such as Paypal, Webmoney, Western Union, and others, allow payments and money transfers to be made through the Internet. These services often have accounts that can be funded with an electronic debit from a bank account or by a credit card.

8.     "Twitter" is a social networking website that allows users to send and receive "tweets" which are text messages limited to 140 characters. Users access Twitter through a website, SMS text messages, or mobile device.

9.     "Facebook" is a social networking website that allows users to engage in email and text based chat through the Internet as well as store personal information. Personal information that can be accessed through Facebook includes email and passwords, mobile phone and email address books or "contacts", location status, and payment information, to include stored credit

card information. Unauthorized access to Facebook accounts is often used to commit "spamming" offenses.

10. "Bulletproof hosting" is a term used to describe Internet service providers that advertise their services to customers engaging in criminal activities such as spamming, phishing, botnet operations, etc. These bulletproof hosts shield their clients from legitimate complaints and court process generated by industry and law enforcement in order to ensure that the activities of those clients can continue. "Spamming" is the transmission of unsolicited electronic mail or text messages. "Phishing" is the practice of luring unsuspecting Internet users to a fake Internet site in an attempt to steal passwords or personal identifying information.

11. "Bulletproof domains" is a term to describe a domain such as xyz.com that is protected by bulletproof domain providers. These bulletproof domain providers shield their clients from legitimate complaints and court process generated by industry and law enforcement in order to ensure that the activities of those clients can continue.

## *PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED*

### Subject Identification

5. Thomas Kennedy McCormick ("McCormick ") is a subject of this investigation. As more fully described below, McCormick presently is a student at the University of Massachusetts – Amherst majoring in Computer Science. His permanent residential address is 10 Sibley Court, Cambridge, MA. His student residential address is 231 Baker Hall, 160 Clark Hill Road, Amherst, MA. McCormick interned at Microsoft during the Summers of 2009, 2010, and 2013. He interned at Cisco during the Summer of 2012. McCormick uses the online alias, email addresses, domain, and IP address below:

    a. fubar

4

    b. infestedtom@gmail.com

    c. not.a.russian.spammer@gmail.com

    d. tkmccormick@gmail.com

    e. root@botnet.biz

    f. botnet.biz

    g. 46.166.143.138

He used these online aliases to conduct his criminal activity, described below.

### Investigation of Subject Thomas McCormick

6.    Over a period of years, multiple undercover FBI employees have observed that Darkode is an online criminal hacking forum located at the Internet domain Darkode.com that caters to individuals involved in the creation and distribution of malware; operation of botnets; trafficking of stolen personally identifiable information (PII); money laundering; and other cyber criminal activity. Through undercover purchases from members of the Darkode hacking forum, and undercover monitoring of the Darkode forum up through the present time, the FBI has learned that Darkode members participate in complex criminal computer intrusions and computer fraud. On the forum, members buy and sell malware, infrastructure to host malware, PII, and unlicensed money transfer (money laundering) services. Darkode is a self-contained market governed by rules and logic that closely mimic those of the legitimate business world, including expectations about its members' conduct and a system of stratification based on knowledge, skill, activities, and reputation. Membership in the forum is by invitation only and is granted only once a prospect is confirmed by other members of the forum as having technical or other qualifications that will promote the activities of the forum. Logging onto the forum requires both a username or account and password both of which are chosen by, and unique to, the member.

5

7.    A confidential source ("CHS") has been cooperating with the FBI since October 2012.  CHS has provided information to the FBI on multiple occasions that has been corroborated, and CHS has never provided information that was later determined to be inaccurate. CHS is a member of the Darkode forum, through which he has administrative access to login information and communications between forum members at Darkode.com.  CHS informed agents of the FBI that an individual using the Darkode username or account "fubar" is an administrator on Darkode and that "fubar" was logged into the forum as recently as September 10, 2013.  As described below, the FBI's investigation of Darkode and McCormick's participation in Darkode has revealed that the Darkode administrator using the account name fubar is McCormick.

8.    CHS provided the FBI a copy of the Darkode forum's logs and communications. Those logs confirm that the fubar account was logged into on September 10, 2013.  According to CHS, the Darkode administrator using the account name fubar performs administrator functions on the forum such as user administration, moderation of threads of posts, and ensuring overall continued success of the forum, including but not limited to moderating and managing sales threads for the latest malware; services to render malware undetectable to antivirus software; access to botnets; infrastructure to host a botnet (also known as bulletproof hosting and bulletproof domains); databases of personally identifiable information (PII) such as social security numbers; email lists for spam; and administrator access to compromised servers.  CHS informed the FBI that fubar has been a member of Darkode since at least March 21, 2009, and continues to participate in the forum and act as administrator to the present.

9.    Among the Darkode communications provided to the FBI by CHS was an exchange of messages through the Darkode forum from January 23 through January 25, 2013, between Darkode.com users R3vProxy and fubar with the subject, "Question Based on ur

6

experience using Neteller." R3vProxy asked fubar, "i got Ukash from different countries, could I transfer the money from it to neteller, and withdraw it without any issues? Any problem I will face based on ur experience, things I need to take precaution of?" Fubar replied, "I never ended up being able to use it sadly, are you trying to cashout ukash from ransomware or what?" R3vProxy replied, "yes I am tryin to cash out ukash from ransomware, and the issue is, I got ukash from 2 different counties, and no way to get the amount to use. You mean that you stopped using ransomware , or used an alternative method to get the money? If neteller didn't work, u would have done something." Fubar replied, "I don't do ransomware anymore, but I always had trouble cashing out UKash vouchers because the security crap would always lock me out. I just ended up selling those in bulk and cashing the PSC vouchers myself since they are (were?) a lot easier securitywise."

10. Based on my training and experience, I know that UKash and Pay Safe Card (PSC) are prepaid card vendors that are commonly used in ransomware schemes to trick a victim into purchasing a prepaid card voucher and providing the voucher to the cyber criminal responsible for the scheme. Ransomware is a type of malware that holds a personal computer ransom by locking victims out of their computers and preventing the victims from accessing files on the computers until the victims pay a fee. The ransomware displays a banner with the logo of authorities of the victim's country (the Department of Justice or the Federal Bureau of Investigation for a United States victim) and accuses the victim of accessing contraband such as child pornography and typically instructs the victim to purchase a UKash or PSC prepaid voucher in order to regain access to his or her personal computer. Once the victim inputs the prepaid voucher information into the ransomware, the victim's computer is unlocked, and the cyber criminal responsible for the scheme cashes out the voucher.

7

**Undercover Purchase from fubar**

11.     On or about December 14, 2009, an FBI Undercover Employee ("UCE")
conducted a consensually recorded internet chat conversation with an individual having the online
moniker, fubar, later identified as McCormick (see below).   Fubar and UCE communicated via
MSN Messenger where fubar used the MSN Messenger account root@botnet.biz and MSN
Messenger display name "fubar – Selling latest Zeus."   Fubar told UCE that he was selling
"installs" located in a variety of countries.   An individual selling installs is offering to install, for a
fee, another individual's malware on a compromised computer that is part of a botnet.   In addition
to selling installs, fubar told UCE that he is assisting with the sale of the "Zeus Trojan," aka, "Zeus
Bot," which is malware used to harvest banking credentials from victims for the purpose of
electronically stealing funds from those victims.   Fubar provided an itemized price list for the
baseline version of Zeus and available modules as follows:

Base Version: $4,000 Webmoney (WMZ)

Windows 7/Vista Compatibility Module: $2,000 WMZ

Backconnect Module: $1,500 WMZ

Firefox Grabbing Module: $2,000 WMZ

Jabber / IRC Notification: $500 WMZ

FTP Clients Saved Login Grabbing Module: $2,000 WMZ

VNC Module: $10,000 WMZ.

12.     On January 5, 2010, while negotiating the purchase of installs, fubar invited UCE
to an IRC channel that he operates from a website/domain that fubar indicated was his,
www.botnet.biz.   Fubar provided the following parameters for joining the IRC channel:
irc.botnet.biz, Port – 6667, SSL – 2297, 6697.

8

13. On January 8, 2010, fubar changed his MSN Messenger display name to "fubar – Selling bulletproof domains."

14. On January 13, 2010, UCE negotiated the purchase of Zeus Bot for $7,200 from fubar. Fubar indicated he was selling the malware on behalf of the Zeus Bot author. UCE wired the $7,200 to the Zeus Bot author's Webmoney account and fubar subsequently provided a link for UCE to download a copy of the malware. Fubar provided the malicious software, which the United States Computer Emergency Response Team (CERT) determined to be the Zeus Bot malware, and a text document, manual_ru.txt, which appeared to be a user manual for Zeus Bot.

15. In the same January 13, 2010, online chat, fubar told UCE that he coded malware that spread via Facebook and Twitter. The malware involved "CPA" which stands for Cost Per Action and relates to online advertising. Fubar made money when an individual filled out an online form expecting to receive an itunes giftcard. The malware would then spread or infect other computers via Facebook and Twitter, online social media networks. Fubar also stated that the malware logged passwords.

16. During the January 13, 2010, Messenger online chat, UCE also asked fubar if he had a keylogger for a Mac computer. Mac refers to a series of computers designed and manufactured by Apple Inc. Fubar replied that UCE should "check the one on DK." DK refers to the online criminal underground forum, Darkode.com.

## Fubar and Other Aliases Used by McCormick

17. The Darkode administrator using the Darkode account and online alias fubar is Thomas Kennedy McCormick. McCormick also uses the domain name botnet.biz, and the email address root@botnet.biz. This is supported by the following connections:

9

a.      Microsoft Corporation provided to the FBI a resume that Thomas McCormick submitted to Microsoft when applying for an internship in the Summer of 2013.  The resume listed McCormick's email address as tkmccormick@gmail.com, telephone number as +1.617.785.5039, and permanent address as 10 Sibley Court, Cambridge, MA.  The resume listed McCormick's school address as 413 Greenough Hall – Umass, 120 Orchard Hill Drive, Amherst, MA, which the University of Massachusetts has confirmed was McCormick's on-campus address during the last school year. McCormick further listed on his resume that he attended Cambridge Rindge and Latin High School.  He also listed skills of malware analysis and reverse engineering, cybercrime, cyber espionage, and malware intelligence.  McCormick also listed that he was previously employed by Cisco Systems and Microsoft Corporation as an intern.

b.      Records obtained from Google, Inc., reveal that the email address tkmccormick@gmail.com was used as a secondary email address in the registration of the email address infestedtom@gmail.com.  In turn, the email address infestedtom@gmail.com was used as a secondary email address in the registration of the email address not.a.russian.spammer@gmail.com.  Finally, emails sent to not.a.russian.spammer@gmail.com were set by the account holder to be automatically forwarded to the Google email address root@botnet.biz, which was the MSN Messenger account used by McCormick in the undercover purchases described above.

c.      CHS provided that between October 3, 2012, and January 30, 2013, the fubar administrator account on Darkode.com was accessed from the IP address 46.166.143.138 on at least 28 separate occasions.  On August 8, 2012, a Whois search

revealed that the IP address 46.166.143.138 was assigned to the domain name botnet.biz.[1] According to Whois, the botnet.biz domain name was registered with the name Tom MacConner, oceanlab, llc, address 13435 White Plains St, Spring Hill 34668, telephone number +1.6173634145, and email address not.a.russian.spammer@gmail.com.

    d.     Google provided records to the FBI revealing that an email dated April 1, 2012, was sent to email address not.a.russian.spammer@gmail.com and forwarded to email address root@botnet.biz. The email was from the domain registrar Namecheap.com and contained order information regarding the purchase of two domain names, rdon.me and ypri.de. The username for the Namecheap.com account was identified as "fubar." The name on the account was Tom MacConner, with address 13435 White Plains St, Spring Hill 34668. Another email from Namecheap.com, dated August 27, 2012, was sent to email address not.a.russian.spammer@gmail.com and forwarded to email address root@botnet.biz. The email contained an expiration notice for the botnet.biz domain and stated that the domain was registered on October 27, 2009, for a period of three years. A Whois lookup on November 26, 2013, reveals that the domain botnet.biz remains registered to Tom MacConner, oceanlab, llc, address 13435 White Plains St, Spring Hill, Hernando FL 34609, telephone number +1.6173634145, and email address not.a.russian.spammer@gmail.com.

    e.     The FBI obtained pen trap information from The University of Massachusetts - Amherst for McCormick's University account, tkmccorm. From January 22, 2013, to March 12, 2013, McCormick's account connected to the IP address assigned to

---

[1] Based on my training and experience, I know that Whois is akin to a reverse telephone directory for the Internet and provides information for Internet domains such as the name and contact information used by an individual to register a domain. Whois is known to be a reliable query tool to determine the owner or registrant of domain names, and IP addresses and associated domain names.

botnet.biz, 46.166.143.138, weekly, and during some weeks connected daily. The pen trap information was collected pursuant to a court order issued in the District of Columbia that was signed on January 11, 2013. FBI equipment collected pen trap information for the tkmccorm account's Internet access at the University of Massachusetts - Amherst from January 19, 2013 through March 12, 2013.

18.     On August 8, 2012, a Rindge School of Technical Arts website listed Thomas McCormick as an Information Technology Level 3 student and included a picture of Thomas McCormick. The Rindge School is based in Cambridge, Massachusetts, and, as described above, McCormick stated on the resume he provided to Microsoft in relation to his 2013 Summer internship with Microsoft that he had attended the Rindge School. The photograph on the Rindge School website matches a photograph provided to the FBI by the University of Massachusetts of the student named Thomas McCormick presently residing in the SUBJECT PREMISES.

### McCormick's Residence in the SUBJECT PREMISES

19.     University of Massachusetts – Amherst security logs for McCormick were provided to the FBI for November 15, 2013, through November 24, 2013, and showed that McCormick entered his assigned dorm, Baker Hall, 160 Clark Hill Road, Amherst, MA, each day. Records obtained from the University of Massachusetts on November 25, 2013, also indicate that McCormick lives in a two-person room, Room 231, and has a roommate. On November 25, 2013, an FBI agent observed the exterior of Room 231. Room 231 has a black colored sign with white-colored numbers "231" appearing to the left of a blue-colored door frame with a tan-colored door bearing two pink-colored signs, each with a Mickey Mouse logo, and one with the name "Askar" and the other with the name "Thomas" handwritten on the signs.

20.    Based on all of the foregoing, it is reasonable to believe that Thomas Kennedy McCormick, student residential address 231 Baker Hall, 160 Clark Hill Road, Amherst, MA, is the owner and subscriber of the Darkode.com fubar account, root@botnet.biz MSN Messenger account, and root@botnet.biz Google account.

21.    Based on my training and experience, it is reasonable to believe that McCormick accesses Darkode.com from the location where he resides, currently his student residence, and that there is currently evidence relating to his activities on and through Darkode.com at the SUBJECT PREMISES.

## *PROBABLE CAUSE TO BELIEVE THAT THE PREMISES TO BE SEARCHED CONTAIN EVIDENCE, FRUITS, AND INSTRUMENTALITIES*

22.    Computer hardware, software, documentation, email, instant messages, notes, records, data logs, passwords, and data security devices may be important to a criminal investigation in two distinct ways and important respects:   (1) the objects themselves may be instrumentalities, fruits, or evidence of a crime, and/or (2) the objects may have been used to collect and store information about crimes in the form of computer data.

23.    Through investigating the creation, use and distribution of malware, I know that in order for individuals to communicate with criminal forums and co-conspirators online, and to commit crimes online, they must use a computer.   In my experience, individuals engaged in the commission of these crimes use electronics including but not limited to desktop computers, laptop computers, tablet computers, cellular phones, and media storage devices such as thumb drives and external hard drives.   Portable electronic devices used by an individual communicating with criminal forums and co-conspirators online are typically stored at his or her residence.   It is

13

reasonable to believe that McCormick likely has some or all of these electronic devices at the SUBJECT PREMISES.

## *SEIZURE OF COMPUTER EQUIPMENT AND DATA*

24.     From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in computer hardware, computer software, computer-related documentation, and storage media. Some storage media, such as thumb drives, can be smaller than a stick of gum and can therefore be stored almost anywhere.

25.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

26.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or even years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

> a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

> b.     Even after files have been deleted, they can be recovered months or years

14

later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.      Other evidence regarding the use of the computer to connect to the Internet also is likely to be stored on the computer.  For example, email programs commonly maintain a log of sent, received and deleted email communications.  Even if such information was manually deleted from the computer, forensic examination often can retrieve such information.

15

27.     Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, computer-related documentation, and storage media ("computer equipment") be seized and subsequently processed by a qualified computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because of:

> a.     The volume of evidence — storage media such as hard disks, flash drives, CD-ROMs, and DVD-ROMs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.
>
> b.     Technical requirements — analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures,

16

> designed to protect the integrity of the evidence and to recover even "hidden,"
> deleted, compressed, password-protected, or encrypted files. Many commercial
> computer software programs also save data in unique formats that are not
> conducive to standard data searches. Additionally, computer evidence is
> extremely vulnerable to tampering or destruction, both from external sources and
> destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or
seize the computer equipment for subsequent processing elsewhere.

28. The premises may contain computer equipment whose use in the crime(s) or
storage of the things described in this warrant is impractical to determine at the scene. Computer
equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In
addition, technical, time, safety, or other constraints can prevent definitive determination of their
ownership at the premises during the execution of this warrant. If the things described in
Attachment B are of the type that might be found on any of the computer equipment, this
application seeks permission to search and seize them onsite or off-site in order to determine their
true use or contents, regardless of how their contents or ownership appear or are described by
others at the scene of the search.

## CONCLUSION

29. Based on the information described above, I have probable cause to believe that
Thomas McCormick has violated 18 U.S.C. §§ Sections 1030(a)(5)(A), 1030(a)(5)(B), and
1030(a)(5)(C) (Fraud and related activity in connection with computers).

30. Based on the information described above, I also have probable cause to believe
that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are

17

contained within the premises described in Attachment A.

Sworn to under the pains and penalties of perjury,

DAVID HITCHCOCK
SPECIAL AGENT, FBI

Subscribed and sworn to before me on _December 4, 2013_

UNITED STATES ~~DISTRICT~~ MAGISTRATE JUDGE
*KENNETH P. NEIMAN*

18

## ATTACHMENT A

### DESCRIPTION OF THE PREMISES TO BE SEARCHED

The premises to be searched are located at 231 Baker Hall, 160 Clark Hill Road, Amherst, MA.  The building at 231 Baker Hall, 160 Clark Hill Road, Amherst, MA is a University of Massachusetts – Amherst dormitory.  Baker Hall is a red-colored brick, five-story building consisting of a Ground Floor and Floors 1 through 4 which are located above the Ground Floor. The building name, "Baker," is found on a beige-colored sign with black letters located on the South wall, described as F5 on a University of Massachusetts – Amherst Floor Plan of Baker Hall. The South wall of Baker Hall has a single entrance with five concrete steps leading to a black-colored door.  Room 231 is a two-person dorm room located on Floor 2.  A black colored sign with white-colored numbers "231" appear to the left of a blue-colored door frame with a tan-colored door bearing two pink-colored signs, each with a Mickey Mouse logo, and one with the name "Askar" and the other with the name "Thomas" handwritten on the signs with a red-colored marker.

19

## ATTACHMENT B

### ITEMS TO BE SEIZED

I.      All records, in whatever form, and tangible objects that constitute evidence, fruits, or

instrumentalities of 18 U.S.C. §§ 1030(a)(5)(A), 1030(a)(5)(B), and 1030(a)(5)(C) (Fraud and

related activity in connection with computers), including those related to:

      A.      The following people, entities, physical addresses, telephone numbers,

          bank accounts, websites, e-mail addresses, and IP addresses:

          1.      fubar

          2.      infestedtom@gmail.com

          3.      not.a.russian.spammer@gmail.com

          4.      tkmccormick@gmail.com

          5.      root@botnet.biz

          6.      botnet.biz

          7.      darkode.com

          8.      46.166.143.138

      B.      The following topics:

          1.      Hacking forums

          2.      Malicious code

          3.      Bulletproof hosting

          4.      Spamming

          5.      Bitcoin mining

          6.      Ransomware

          7.      Botnets

8.     Proxies

9.     DDoS attacks

10.    The sale, rental or lease of access to botnets or proxies, or the advertising for the sale, rental or lease of access to botnets or proxies

11.    Personally identifiable information (PII)

12.    Money laundering

C.   The payment, receipt, transfer, or storage of money or other things of value by McCormick or any one of the names listed above, including:

1.     Bank, credit union, investment, money transfer, and other financial accounts;

2.     Credit and debit card accounts;

3.     Tax statements and returns;

4.     Business or personal expenses;

5.     Income, whether from wages or investments;

6.     Loans;

D.   The travel or whereabouts of McCormick between October 27, 2009 and present;

E.   The identity, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

F.   For any computer hardware, computer software, computer-related documentation, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

21

1.     evidence of who used, owned, or controlled the computer equipment;

2.     evidence of malicious computer software that would allow others to control the computer equipment, computer software, or storage media, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

3.     evidence of the attachment of other computer hardware or storage media;

4.     evidence of counter-forensic programs and associated data that are designed to eliminate data;

5.     evidence of the times the computer equipment was used;

6.     passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

7.     records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media; and

G.     Records and tangible objects relating to the ownership, occupancy, or use of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

II.     All computer hardware, computer software, computer-related documentation, and storage media.  Off-site searching of these items shall be limited to searching for the items

22

described in paragraph I.

## DEFINITIONS

For the purpose of this warrant:

    A.    "Computer equipment" means any computer hardware, computer software, computer-related documentation, storage media, and data.

    B.    "Computer hardware" means any electronic device capable of data processing (such as a computer, personal digital assistant, cellular telephone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

    C.    "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

    D.    "Computer-related documentation" means any material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

    E.    "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive,

23

or memory card).

F.    "Data" means all information stored on storage media of any form in any storage format and for any purpose.

G.    "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If, after inspecting seized computer equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally-identifying information of victims; or the fruits or instrumentalities of crime.